IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ERIBERTO RODRIGUEZ, et al.,

             Plaintiffs,

    v.

CITY OF PHILADELPHIA, et al.,

             Defendants.

CIVIL ACTION
NO. 14-4435

**OPINION**

**Slomsky, J.**                                                                                          **October 31, 2017**

## I.  INTRODUCTION

Plaintiffs, family members of Joanne Rodriguez and the administrator of her estate, bring this action charging various entities and persons with the death of Joanne and the posthumous birth of her son, Xavier, born with brain damage.  (Doc. No. 33.)  Paramedics had transported Joanne to Temple University Hospital by ambulance, whose rear door temporarily became stuck in the locked position upon arrival, trapping her and her unborn son inside for a matter of minutes.  (Id. ¶¶ 61-72.)  Plaintiffs allege negligence, civil rights violations, strict products liability, breach of warranty, and wrongful death, in part on the basis that the apparently defective locking mechanism installed in the ambulance contributed to Joanne's death and Xavier's disability.  (See generally id.)

On July 24, 2014, Plaintiffs Eriberto Rodriguez, Joanne's husband, and Daisy Morales, Xavier's maternal grandmother, commenced this suit in the Philadelphia Court of Common Pleas and included as a Defendant TriMark Corporation ("TriMark"), the supplier of the locking

mechanism used in the ambulance that transported Joanne ("Medic Unit 22").[1]  (Id. ¶¶ 14, 21.)

That same day, Defendants removed the case to this Court.  (Id. ¶ 22.)  On August 29, 2014,

Plaintiffs filed an Amended Complaint,[2] and on December 8, 2014, Plaintiffs filed a Second

Amended Complaint.  (Doc. Nos. 10, 33.)

On December 22, 2014, TriMark filed a Third Party Complaint against distributors HMI

Group; HMI USA, Inc.; HMI, LTD.; and HMI Sources, Ltd. (hereinafter collectively "HMI"),

with which TriMark contracted for the purchase of actuators[3] for ultimate distribution and

installation in emergency transport vehicles, including ambulances and specifically Medic Unit

22.  (Doc. No. 35 ¶ 6.)

On December 21, 2015, TriMark amended its Third Party Complaint, adding as Third

Party Defendants Tesor Plus Corporation ("Tesor") and Pilock Corporation ("Pilock"), which

were identified by HMI as manufacturers of the actuator at issue that was supplied to HMI before

being used by TriMark.  (Doc. No. 75 ¶ 9.)  On August 19, 2016, Tesor and Pilock filed a Motion

to Dismiss the Amended Third Party Complaint pursuant to Federal Rule of Civil Procedure

12(b)(2) for lack of personal jurisdiction.  (Doc. No. 90.)  On February 17, 2017, this Court

---

[1]  Plaintiffs also named as Defendants the City of Philadelphia; the Philadelphia Fire Department Emergency Medical Services; April Smallwood and Lisa McCall, who were staffed on Medic Unit 22; VCI Emergency Vehicle Specialists, the seller of Medic Unit 22; and Horton Emergency Vehicles Co., the manufacturer of Medic Unit 22.  (Doc. No. 33 ¶¶ 9-16.)

[2]  In their Amended Complaint, Plaintiffs added as a Defendant C. Crawford Mechem, M.D., Medical Director for Defendant Philadelphia Fire Department Emergency Medical Services. (Doc. No. 10 ¶ 11.)

[3]  An actuator is a mechanical device for moving or controlling something.  Actuator, MERRIAM-WEBSTER, https://www.merriam-webster.com/actuator (last visited Oct. 30, 2017).

entered an Order affording the opportunity for jurisdictional discovery and denying Tesor and Pilock's Motion to Dismiss without prejudice. (Doc. No. 119.)

On June 1, 2017, Tesor and Pilock again filed a Motion to Dismiss the Amended Third Party Complaint pursuant to Rule 12(b)(2). (Doc. No. 126.) On June 15, 2017, TriMark filed a Response in Opposition to Tesor and Pilock's Motion.[4] (Doc. Nos. 132-36.) On June 22, 2017, Tesor and Pilock filed a Reply. (Doc. No. 140.) On July 7, 2017, a hearing was held on the Motion. (Doc. No. 142.) The Motion is now ripe for a decision.[5]

## II. BACKGROUND

### A. Underlying Accident

On October 1, 2012, paramedics from the Philadelphia Fire Department Emergency Medical Services responded to a 911 call for Joanne prompted by an accidental fall at her parent's home. (Doc. No. 33 ¶¶ 1, 84.) Joanne was 24 years old, around 36 weeks pregnant, and under treatment for deep vein thrombosis. (Id.) After assessing the situation, the paramedics loaded Joanne into Medic Unit 22 and transported her to Temple University Hospital in Philadelphia. (Id.) Upon arrival at the hospital, the rear door of the ambulance, out of which Joanne needed to exit in order to receive aid in the hospital, was temporarily stuck in the locked position. (Id.)

Joanne was trapped inside the ambulance for three to four minutes before hospital personnel were able to open the door. (Id. ¶¶ 61-72.) She later expired in the hospital due to

---

[4]    On June 22, 2016, Horton Emergency Vehicles Co. filed a Response in Opposition to Tesor and Pilock's Motion, adopting the arguments of TriMark in full. (Doc. No. 139.)

[5]    In reaching a decision, the Court has considered the Amended Third Party Complaint (Doc. No. 75), the Motion to Dismiss the Amended Third Party Complaint (Doc. No. 126), TriMark's Response in Opposition (Doc. Nos. 132-36.), Tesor and Pilock's Reply (Doc. No. 140), and the arguments made by counsel for the parties during the hearing on the Motion on July 13, 2017 (Doc. No. 27).

pulmonary embolism related to her deep vein thrombosis. (Id. ¶ 104.) Xavier was born by emergency cesarean section and sustained brain damage from a deprivation of oxygen. (Id. ¶¶ 1, 77-84.)

An investigation following the events of October 1, 2012 ultimately determined that Medic Unit 22's door lock system was defective. (Id. ¶¶ 93-99.) Specifically, TriMark found that the "power lock actuator" in the door lock portion of the system had failed. (Id. ¶ 99.) It was revealed that Tesor's actuators were used in all 75 ambulances in Philadelphia's fleet. (Id. ¶ 96.) After inspecting the entire fleet of 75 ambulances, investigators discovered that two additional medic units contained this actuator defect. (Id.) According to documents provided by Horton Emergency Vehicles Co., Philadelphia was not the only Pennsylvania municipality with affected ambulances—fleets owned by Central Bucks, Bensalem and Berwyn were also affected. (Doc. No. 136-6 at 14.) Neither the quantity of Tesor's actuators used in those fleets, nor the time period in which its actuators entered Pennsylvania, has been established in the record.

### B.    Manufacturing of Medic Unit 22

TriMark is a privately owned corporation that maintains a principal place of business in New Hampton, Iowa, and conducts business in several states, including Pennsylvania. (Doc. No. 75 ¶ 1.) It supplies door hardware systems for emergency transportation vehicles like the one used in Medic Unit 22. (Id. ¶ 7.) To assemble these door hardware systems, TriMark contracted with HMI to supply actuators and other parts from foreign manufacturers. (Id. ¶ 8.)

HMI has a marketing brochure that describes how the company "manages the entire supply chain for you, from development to delivery." (Doc. No. 135-11 at 3.) Under a section called "Quality Assurance," it notes that HMI helps its "Asian vendors . . . better understand your quality requirements" and that its engineers "engage in an ongoing dialogue with you and the manufacturer to arrive at acceptable and achievable quality standards." (Id.)

4

Among the foreign companies that worked with HMI to supply actuators to TriMark were Tesor and Pilock. (Doc. No. 75 ¶ 9.) Both corporations are incorporated in the Republic of China, with principal and business headquarters in Taiwan. (Id. ¶¶ 3-4.) Neither company is incorporated, licensed, or registered to do business in the Commonwealth of Pennsylvania. (Doc. No. 126-3 at 3; Doc. No. 126-6 at 3.) Lobo Chen, General Manager and largest shareholder of both Tesor and Pilock, stated in his deposition that the two companies are separate entities and their boards of directors are distinct, although they share some common members.[6] (Doc. No. 135-6 at 28:24 to 29:9.)

Contrary to Lobo Chen's assertion, Michael Chen, a salesperson for Tesor and Pilock who reports directly to Lobo, explained in an e-mail from 2010 to Dave Magner, an engineer for TriMark, "Tesor and Pilock are the same company" and "have two different name[s] to service different countries." (Doc. No. 135-7 at 10; see 135-6 at 79:21 to 80:3.) Consistent with that understanding, HMI stated in its Answers and Responses to Interrogatories of Defendant TriMark that "Pilock uses the Chinese names for Pilock and Tesor Plus interchangeably in their communications, and there is only one manufacturing facility producing the Pilock actuators identified with both Chinese names on its signboard." (Doc. No. 136-14 at 5.) Lobo Chen stated in his deposition that before October 2004, when Pilock stopped making actuators, it was using a certain location as its manufacturing facility; and after November 2004, Tesor made actuators at that location. (Doc. No. 135-6 at 36:4-10.)

---

[6] TriMark maintains that Tesor and Pilock are the same company, and that the names are used interchangeably. Therefore, at times it is unclear whether conduct can be attributed to Tesor or Pilock or both, given that many documents in the record attribute individual acts to both companies. This Opinion signals instances in which clarity is lacking when it attributes conduct to "Tesor or Pilock," rather than one or the other.

Tesor and Pilock conducted business only with HMI's facility in Taiwan ("HMI Taiwan"), and Lobo Chen testified that until 2016, he was unaware HMI had any facilities in the United States. (Doc. No. 69:2-19.) Lobo Chen asserts that he never knew where HMI ultimately sold Tesor's products. (See Doc. No. 126-6 ¶¶ 14-16.) He stated in his affidavit that Tesor's actuators are sold to "distributors in Taiwan who do not reveal to Tesor Plus the name, location and identity of their re-sale/purchasing customers or the location of those re-sale/purchasing customers." (Id. ¶ 14.) According to Lobo, Tesor sells its products "ex-factory," which by its custom entails shipping its products to locations in Taiwan designated by the customers, who are responsible for handling transportation from there to any location. (Doc. No. 126-4 at 52:11 to 53:20.)

Two other Tesor employees, Rita Hu and Lin YanKun, testified about their lack of knowledge that Tesor's products were being shipped to the United States as well as their lack of knowledge about TriMark in general. Hu and YanKun are Tesor's former and current domestic sales representative, respectively. (Doc. No. 126-8; Doc. No. 126-9.) Both reside and work in Taiwan, speak and read Taiwanese and Mandarin, and have a minimal understanding of the English language. (Doc. No. 126-8 ¶¶ 1-3; Doc. No. 126-9 ¶¶ 1-3.)

Hu received a purchase order from HMI Taiwan in 2011, which was written in English and regarded shipment of actuators. (Doc. No. 126-4 at 55:13 to 56:12, 57:9-13, 65:22 to 66:3.) Hu and YanKun testified that Tesor does not prepare HMI Taiwan's purchase orders and that HMI Taiwan makes all shipping arrangements for products bought from Tesor, and pays for and provides the shipment information on Tesor purchases. (Doc. No. 126-8 ¶¶ 5-6, 10; Doc. No. 126-9 ¶¶ 5-6, 10.) Further, neither is familiar with TriMark, and because their understanding of English is minimal, they both understood the term "Tri/Mark" on the purchase order to mean

"shipping mark," which is the label provided by HMI Taiwan. (Doc. No. 126-8 ¶¶ 7-8; Doc. No. 126-9 ¶¶ 7-8.) They also did not know what the word "Minneapolis" on the purchase order meant; and there was no other indicator on the purchase order that the products were being shipped to somewhere in the United States. (Doc. No. 126-8 ¶ 11; Doc. No. 126-9 ¶ 11.)

Tesor's actuators were manufactured for use in vehicles. (Id. at 64:22 to 65:15.) More than half of Tesor's products are manufactured for use in vehicles. (Id. at 104:9-17.) Tesor employs salespersons like Michael Chen who target foreign countries, including the United States, although Russia and Australia generate its main business. (Id. at 77:5 to 78:14.)

Lobo Chen attends a yearly Consumer Electronics Show in Las Vegas, Nevada, and either he or another representative of Tesor and Pilock has attended trade shows in Florida and Louisiana. (Doc. No. 135-6 at 93:12 to 94:15; see Doc. No. 135-13.) Michael Chen accompanied Lobo to the Las Vegas trade show three times: in 2010, 2011 and 2012. (Doc. No. 135-6 at 94:16-23.) At the trade show, Tesor representatives have a booth that interested persons can approach to inquire about the company. (Id. at 94:2-15.) Tesor representatives maintain records of people who approached their booth for information. (Id.)

Aside from the trade shows, the only person who travels on behalf of Tesor or Pilock to the United States for business trips is Lobo Chen. (Doc. No. 126-4 at 111:21 to 112:2.) He has taken three business-related trips to the United States, one to Detroit, Michigan, and two others to California, to meet potential customers. (Id. at 110:1 to 111:11.) He has been to Pennsylvania once, when a friend drove him through part of Pennsylvania on a social visit over 20 years ago. (Id. at 117:16 to 118:8.)

Tesor maintains two English-language websites, one at tesorplus.com and the other through the Alibaba website, but contends that they are for informational purposes only; and

while customers can send inquiries to Tesor through its tesorplus.com website, neither website permits direct ordering. (Doc. No. 135-6 at 98:11 to 101:2.) Tesor's online presence also includes an eight minute, twenty-five second YouTube video promoting the company, which was uploaded on December 24, 2012. (Id. at 105:9-19.)

While TriMark at all times before the accident purchased Tesor's actuators from HMI and not Tesor or Pilock, there is some evidence in the record that might suggest there was a business relationship among TriMark and Tesor and Pilock. In 2001, Lobo Chen was identified in an e-mail between Dave Magner of TriMark and Jerry Lin of HMI as a contact person and the one who "will be handling Tri/Mark's projects from now on." (Doc. No. 135-7 at 12.) In 2008, Magner contacted Lin to inform him that he would be in Taipei, Taiwan, and wanted to meet to discuss "any new products that might be available from Pilock or others," and "to make sure all is going well with Pilock or others." (Doc. No. 135-9 at 4.) Magner's "main topic of interest" was "electronics or motorize[d] products that would be in a door or vehicle." (Id.)

The two arranged a visit to Pilock, during which Magner reviewed the assembly area. (Id. at 2.) Magner pointed out "pin support fracturing" in some actuators, and Pilock and HMI agreed to "prepare a recommended plan of action for [TriMark's] review." (Id.) Magner had also visited Tesor or Pilock's facilities in 2005 along with Anita Reichling, another TriMark engineer. (Doc. No. 135-8 ¶ 7.) In each of these visits, TriMark met with employees of Tesor or Pilock and discussed projects, including the actuator model at issue in this case. (Id.)

Magner also communicated directly with Michael Chen in 2010 to inquire about Tesor's actuators after Magner visited Tesor's Global Source website, which it no longer operates. (Doc. No. 135-7 at 13.) The two exchanged e-mails for a period between June 8, 2010 and July 28, 2010. (Id.) During the course of this conversation, Michael Chen made statements

characterizing Tesor or Pilock's relationship with TriMark, such as "I guess the last work partnership was [a] really long time ago," "we are going into a partnership with [TriMark] and HMI," and "you are [a] longtime customer of us or actually HMI since your order is handle[d] by them." (Id. at 8, 10.) Michael Chen also discussed problems between his employer and HMI, and suggested a company to replace HMI, Creative Works. (Id. at 8.) Magner agreed to "consider it" if Creative Works would submit a quote, but explained that TriMark "had a lot of issues with late delivery from Creative Works in the last couple months," while it has "had no delivery issues" with HMI. (Id. at 7.)

Magner also e-mailed Michael Chen in September 2012 to inform him that Magner and another TriMark employee would like to visit Tesor or Pilock, and Michael Chen responded to state that he remembered Magner but was away on business. (Doc. No. 135-10 at 3-5.) Another Tesor employee then offered to schedule a meeting on October 22 or 23, 2012. (Id. at 2.) There is no record of a follow-up communication.

In two different shipments in June and September of 2015, Tesor sold directly to TriMark an approximate total of 6,000 actuators. (Doc. No. 126-4 at 16:9 to 17:12, 113:12-19; Doc. No. 126-6 ¶ 15.) This constituted approximately one-percent of Tesor's sales in 2015. (Doc. No. 126-4 at 16:9 to 17:12, 113:12-19; Doc. No. 126-6 ¶ 15.)

According to Scott Perkins, Senior Vice President of TriMark, TriMark purchased actuators manufactured by Tesor or Pilock for use in motor vehicle locking systems "on a yearly basis" from late 2002 "until the time of this accident on October 1, 2012 and beyond. Prior to the accident, TriMark purchased over a million locking system actuators, hundreds of thousands of which were the same model number of that installed in [Medic Unit 22]." (Doc. No. 135-8 ¶ 4.)

HMI records show that the actuator found in Medic Unit 22 was produced in June 2011. (Doc. No. 136-8 at 2.)  The shipment was delivered to TriMark in New Hampton, Iowa through Minneapolis, Minnesota.  (Doc. No. 136-2.)  The Purchase Contract between HMI and Tesor also indicates that the actuators were being shipped from Taiwan to TriMark in Minneapolis.  (Doc. No. 136-12.)

### C.    Third Party Defendants' Contacts with Pennsylvania

As noted, Tesor's actuators were used in 75 ambulances in Philadelphia's fleet and in unknown quantities in three other fleets in Pennsylvania, and three of which in Philadelphia's fleet, including the one used in Medic Unit 22, were defective.  (Doc. No. 33 ¶ 96.)  Aside from that, Tesor's and Pilock's contacts with the forum state are limited.  Tesor and Pilock do not conduct business in Pennsylvania, maintain offices or property in Pennsylvania, or interact with the local government.  (Doc. Nos. 126-3, 126-6.)  They do not advertise or market any of their products to any customers located in Pennsylvania.  (Doc. No. 126-3 ¶6; Doc. No. 126-6 ¶ 6.) Lobo Chen is the only person who travels on behalf of Tesor or Pilock to the United States for business trips aside from attending trade shows, and, as noted, he has been to Pennsylvania only once, when a friend drove him through part of Pennsylvania on a social visit over 20 years ago. (Doc. No. 126-4 at 111:21 to 112:2, 117:16 to 118:8.)

## III.    STANDARD OF REVIEW

Plaintiff bears the burden of establishing with reasonable particularity that personal jurisdiction exists when the defendant has made a motion under Rule 12(b)(2), Federal Rules of Civil Procedure, to dismiss for lack of personal jurisdiction.  <u>Gen. Elec. Co. v. Deutz AG</u>, 270 F.3d 144, 150 (3d Cir. 2001).  When, as here, a court does not hold an evidentiary hearing on the motion to dismiss, "the plaintiff need only establish a prima facie case of personal jurisdiction

and . . . is entitled to have its allegations taken as true and all factual disputes drawn in its favor." Miller Yacht Sales, Inc. v. Smith, 384 F.3d 93, 97 (3d Cir. 2004).

When defending against a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, a plaintiff must do more than rely on the pleadings alone. Indeed, the Third Circuit explains that once a motion has been made, "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." Id. at 102 n.6 (quoting Patterson v. FBI, 893 F.3d 595, 603-04 (3d Cir. 1990)). Instead of relying on "mere allegations" to assert personal jurisdiction, the plaintiff must respond to Rule 12(b)(2) motions with "actual proofs." Id.

## IV.    ANALYSIS

Under Federal Rule of Civil Procedure 4(e), a federal court may exercise personal jurisdiction "over a nonresident of the state in which the court sits to the extent authorized by the law of that state." Provident Nat'l Bank v. Cal. Fed. Sav. & Loan Ass'n, 819 F.2d 434, 437 (3d Cir. 1987). Pennsylvania, where this Court sits, provides for jurisdiction "to the fullest extent allowed under the Constitution of the United States" and "based on the most minimum contact with [the] Commonwealth allowed under the Constitution of the United States." 42 Pa. Cons. Stat. § 5322(b).

The Due Process Clause of the Fourteenth Amendment requires that nonresident defendants have "certain minimum contacts within the [forum state]" so that defending the suit "does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). This principle is based on the notion that a defendant has

"fair warning" that it may be subject to a suit in a state where it has a certain level of minimum contacts.[7] <u>Burger King Corp. v. Rudzewicz</u>, 471 U.S. 462, 472 (1985).

Courts have articulated two types of personal jurisdiction: general jurisdiction and specific jurisdiction. <u>See, e.g.</u>, <u>Helicopteros Nacionales de Colombia, S.A. v. Hall</u>, 466 U.S. 408, 414 (1984). When, as here, "no party . . . contends that there is a basis for general jurisdiction in Pennsylvania . . . [courts] are free to consider solely whether the alternative form of personal jurisdiction is present: specific personal jurisdiction." <u>Pennzoil Prods. Co. v. Colelli & Assocs., Inc.</u>, 149 F.3d 197, 200-01 (3d Cir. 1998). Unfortunately for TriMark, it has failed to establish that this Court has specific jurisdiction over Tesor or Pilock.

### A. Tesor and Pilock Are Not Subject to the Specific Jurisdiction of This Court

To determine whether specific jurisdiction exists, a court must engage in a three-part inquiry: (1) the defendant must have purposefully directed its activities at the forum state; (2) the litigation must arise out of or relate to at least one of those activities; and (3) if the first two requirements have been met, a court may consider whether the exercise of jurisdiction otherwise comports with fair play and substantial justice. <u>D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd.</u>, 566 F.3d 94, 103 (3d Cir. 2009).

---

[7] The latest decision from the United States Supreme Court on personal jurisdiction and on the minimum contacts analysis is <u>Walden v. Fiore</u>, 134 S. Ct. 1115 (2014), in which the Court held that a police officer did not have minimum contacts with the forum state of Nevada for the exercise of personal jurisdiction over him. <u>Id.</u> at 1124. The case involved airline passengers who commenced a <u>Bivens</u> action against a Georgia police officer, alleging that the officer violated their Fourth Amendment rights by seizing cash from them in Georgia during their return trip to Nevada. <u>Id.</u> The facts in <u>Walden</u> are inapposite to the facts of this case, which involve goods being placed into the stream of commerce by an out-of-state manufacturer. Therefore, <u>Walden</u> has no bearing on this decision.

1.    **TriMark has failed to establish that Tesor and Pilock purposefully directed activities at Pennsylvania.**

The first prong of this inquiry involves determining whether a defendant has the requisite minimum contacts within the forum state. To satisfy this prong, the defendant must have "purposefully avail[ed] itself of the privilege of conducting activities within the forum state." Hanson v. Denckla, 357 U.S. 325, 353 (1958). While the defendant need not have entered the forum state, a deliberate targeting of the forum is necessary. Id. Further, jurisdiction must be the result of intentional contact, not mere "random, fortuitous, or attenuated" acts. BP Chems. Ltd. v. Formosa Chem. & Fibre Corp., 229 F.3d 254, 259 (3d Cir. 2000).

Courts have relied on the stream-of-commerce theory to find personal jurisdiction over a nonresident defendant that has placed goods into the forum state indirectly by way of the "stream of commerce." See Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 105 (1987) (O'Connor, J., plurality opinion); Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 203-04 (3d Cir. 1998). Confronted with varying interpretations, the Supreme Court in Asahi Metal Industry Co. attempted to elucidate the stream-of-commerce theory.

In Asahi, a plaintiff injured in a motorcycle accident in California brought suit in California against the Taiwanese corporation that manufactured the motorcycle's tire tube on a theory that the tube was defective. 480 U.S. at 105-06. The Taiwanese corporation, Cheng Shin, then impleaded Asahi Metal Industry Company, Ltd., a Japanese corporation, seeking indemnification because Asahi had manufactured the valve assemblies for Cheng Shin's tire tubes. Id. at 106.

Asahi contested jurisdiction because, like Tesor and Pilock in this case, it had not solicited any business in the forum and had no offices, agents or property there. Id. Further, it sold its tube assemblies to Cheng Shin and had no control over the distribution system that

brought its components into products eventually sold in the forum.  Id. at 106-07.  The California Supreme Court sustained jurisdiction over Asahi on the basis that it knew some of the valve assemblies would be incorporated into tire tubes in California and benefitted indirectly from the sale of products incorporating the components in California.  Id. at 108.

The Supreme Court reversed that ruling after all the Justices agreed that the exercise of personal jurisdiction over Asahi would offend traditional notions of "fair play and substantial justice."  Id. at 116; Id. (Brennan, J., concurring in part and concurring in the judgment); Id. at 121-22 (Stevens, J., concurring in part and concurring in the judgment).  However, the Justices were divided on the level of minimum contacts needed to establish personal jurisdiction under a stream of commerce theory.  Each decision produced a different method of analysis under that theory, none of which was endorsed by a majority of the Court.  Id. at 105 (plurality opinion).

Writing for a four-Justice plurality, Justice O'Connor explained that the insertion of a good into the stream of commerce must be accompanied by some "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State."  Id. at 112.  According to Justice O'Connor, such conduct may include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."  Id.

Justice Brennan, however, disagreed that such additional conduct was necessary.  Id. at 117 (Brennan, J., concurring in part and concurring in the judgment).  Writing for another four-Justice plurality, he noted that the stream of commerce does not consist of "unpredictable currents or eddies, but . . . the regular and anticipated flow of products from manufacture to distribution to retail sale."  Id.  He therefore stated that "[a]s long as a participant in this [regular

and anticipated flow of products] is aware that the final product is being marketed in the forum State, the possibility of a lawsuit there cannot come as a surprise." Id.

The third opinion, that of Justice Stevens, espoused that purposeful availment should be determined by examining a number of factors, including the volume and hazardous character of the product entering the stream of commerce. Id. at 122 (Stevens, J., concurring in part and concurring in the judgment). Nevertheless, he emphasized that "an unwavering line can be drawn between 'mere awareness' that a component will find its way into the forum State and 'purposeful availment' of the forum's market." Id.

When evaluating specific jurisdiction under a stream of commerce theory, some courts of appeals have endorsed Justice O'Connor's "stream-of-commerce plus" theory. See Kernan v. Kurz-Hastings, Inc., 175 F.3d 236, 243-44 (2d Cir. 1999); Vermeulen v. Renault, U.S.A., Inc., 985 F.2d 1534, 1548 (11th Cir. 1993). Others have adopted Justice Brennan's view. See Unspam Techs., Inc., v. Chernuk, 716 F.3d 322, 328 (4th Cir. 2013); Barone v. Rich Bros. Interstate Display Fireworks Co., 25 F.3d 610, 615 (8th Cir. 1994); Ruston Gas Turbines, Inc. v. Donaldson Co., Inc., 9 F.3d 415, 418-20 (5th Cir. 1993). The Third Circuit counseled its trial courts to apply both the O'Connor and Brennan methods. Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 207 n.11 (3d Cir. 1998).

Twenty-four years after the Supreme Court decided Asahi Metal Industry Co., it was again divided when discussing application of the stream of commerce theory. See McIntyre Mach., Ltd. v. Nicastro, 131 S. Ct. 2780 (2011). In McIntyre Machine, a New Jersey plaintiff was injured at work when a metal-shearing machine he was using malfunctioned. Id. at 2786 (Kennedy, J., plurality opinion). The machinist brought a products liability suit against McIntyre Machine, an English company that manufactured the machine. Id. The machinery reached

plaintiff's employer in New Jersey through a third party that acted as McIntyre Machine's distributor in the United States. Id. The only apparent contact between McIntyre Machine and New Jersey was that this single machine ended up in the state. Id. The Supreme Court issued a four-Justice plurality opinion, a two-Justice concurring opinion, and a three-Justice dissent.

Justice Kennedy wrote for the plurality, and found the fact that it was foreseeable defendant's products might be distributed in one or all of the 50 states was not enough, but rather there must be evidence that the out-of-state defendant had "targeted" the forum state in some way. Id. at 2788. Although there was evidence that the British manufacturer had targeted the United States, there was no evidence that it had targeted New Jersey specifically. Id. at 2790. Therefore, the plurality would have held that New Jersey lacked personal jurisdiction over the British manufacturer. Id. at 2790-91.

Justice Breyer authored the concurring opinion, and explained that the Court's precedents demonstrate that "a single sale of a product in a State does not constitute an adequate basis for asserting jurisdiction over an out-of-state defendant, even if that defendant places his goods in the stream of commerce, fully aware (and hoping) that such a sale will take place." Id. at 2792 (Breyer, J., concurring in the judgment). Because the evidence did not establish any connection between the British manufacturer and New Jersey other than a single sale that was achieved through the efforts of an independent distributor, Justice Breyer agreed with the plurality's conclusion, but would have decided the case on a narrower ground. Id. at 2791-91.

Justice Breyer explained why the record was not sufficient to establish personal jurisdiction over the British manufacturer:

> Here, the relevant facts show no "regular . . . flow" or "regular course" of sales in New Jersey; and there is no "something more," such as special state-related design, advertising, advice, marketing, or anything else. Mr. Nicastro, who here bears the burden of proving jurisdiction, has shown no specific effort by

the British Manufacturer to sell in New Jersey. He has introduced no list of potential New Jersey customers who might, for example, have regularly attended trade shows. And he has not otherwise shown that the British Manufacturer "purposefully avail[ed] itself of the privilege of conducting activities" within New Jersey, or that it delivered its goods in the stream of commerce "with the expectation that they will be purchased" by New Jersey users.

Id. at 2792 (alteration in original) (citation omitted). Justice Breyer noted that he "[d]id not agree with the plurality's seemingly strict no-jurisdiction rule," and was also "not persuaded by the absolute approach adopted by the New Jersey Supreme Court," which found that a court could exercise personal jurisdiction over an out-of-state manufacturer so long as the manufacturer "knows or reasonably should know that its products are distributed through a nationwide distribution system that might lead to those products being sold in any of the fifty states." Id. at 2793 (quoting the New Jersey Supreme Court's decision). Justice Breyer found that the New Jersey Supreme Court's rule was problematic both because it did not focus on the defendant's relationship with the forum, leading to the possibility that jurisdiction would rest "upon no more than the occurrence of a product-based accident in the forum State," and because it would result in jurisdiction over all out-of-state manufacturers, no matter how big or small, who distribute goods nationally, without regard to the fairness of making them appear and defend. Id. at 2793-94.

When, as in McIntyre Machine, "a fragmented [Supreme] Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those members who concurred in the judgment on the narrowest grounds . . . .'" Marks v. United States, 430 U.S. 188, 193 (1977) (citation omitted); accord Panetti v. Quarterman, 551 U.S. 930, 949 (2007) (following Marks). The narrowest holding in McIntyre Machine was from Justice Breyer, as his rationale was narrower than the plurality's.

The Third Circuit has yet to issue an opinion addressing the impact of McIntyre Machine on its stream of commerce jurisprudence.  Other circuit courts that had occasion to review the question have held that McIntyre Machine made no change in the law.  AFTG–TG, LLC v. Nuvoton Tech Corp., 689 F.3d 1358, 1363 (Fed. Cir. 2012) ("The narrowest holding [in McIntyre Machine] is that which can be distilled from Justice Breyer's concurrence—that the law remains the same after McIntyre."); accord Ainsworth v. Moffett Eng'g, Ltd., 716 F.3d 174 (5th Cir. 2013) (same); see also Monge v. RG Petro–Machinery (Grp.) Co., 701 F.3d 598, 619 (10th Cir. 2012) (citing McIntyre while applying both the O'Connor and Brennan positions from Asahi).

In view of these other circuit courts' opinions, this Court will proceed on the basis that McIntyre Machine did not change the Supreme Court's jurisdictional framework.  This entails heeding the Third Circuit's instruction to follow both the O'Connor and Brennan formulations from Asahi.  Pennzoil Prods. Co. v. Colelli & Assocs., Inc., 149 F.3d 197, 207 n.11 (3d Cir. 1998).

In this case, the record establishes that Tesor's contacts with Pennsylvania are that its actuators were used in 75 ambulances in Philadelphia's fleet, three of which contained the actuator defect found in Medic Unit 22, and unknown quantities of its actuators were used in affected fleets owned by three other Pennsylvania municipalities.  (Doc. No. 33 ¶ 96; Doc. No. 136-6 at 14.)  TriMark contends that jurisdiction over Tesor and Pilock is proper because the record establishes "more than a fortuitous appearance of a single actuator manufactured by [Tesor and Pilock] in Pennsylvania," and because the two companies "engaged in conduct that made it foreseeable that they should have reasonably anticipated being haled into a Pennsylvania Court."  (Doc. No. 133 at 17.)  Tesor and Pilock submit that they do not have constitutionally sufficient minimum contacts with the forum required for specific jurisdiction, (Doc. No. 126 at

30), and that exercising personal jurisdiction over Tesor or Pilock would not comport with "fair play and substantial justice," (Id. at 31 (quoting Burger King Corp. v. Rudzewicz, 471 U.S. 462, 476 (1985))).

Under Justice O'Connor's stream-of-commerce plus theory, it is apparent that this Court does not have jurisdiction over Tesor or Pilock.  Justice O'Connor articulated that the placement of a product in the stream of commerce must be accompanied by some "[a]dditional conduct of the defendant [that] may indicate an intent or purpose to serve the market in the forum State." Asahi Metal Indus. Co. v. Super. Ct. of Cal., 480 U.S. 102, 112 (1987) (O'Connor, J., plurality opinion).  She continually emphasized that the defendant's activities must target the forum state and not the national market.  Id.  She wrote that additional conduct may include "designing the product for the market in the forum State, advertising in the forum State, establishing channels for providing regular advice to customers in the forum State, or marketing the product through a distributor who has agreed to serve as the sales agent in the forum State."  Id.  Tesor's and Pilock's actions do not rise to this standard because none of their activities can be said to amount to "additional conduct" that specifically targeted Pennsylvania.

While Justice Brennan's approach is narrower than Justice O'Connor's, even under his approach, TriMark has not shown that this Court can exercise personal jurisdiction over Tesor or Pilock.  Justice Brennan wrote that if there is a "regular and anticipated flow of products from manufacture to distribution to retail sale" and the defendant is aware that the final product is being marketed in the forum state, no additional conduct on the defendant's part need be shown to establish minimum contacts.  Id. at 117 (Brennan, J., concurring in part and concurring in the judgment).

The Third Circuit in following this approach has stated that "[e]ven under Justice Brennan's view, the mere knowledge or awareness that one's products will end up in the forum state without some regularity of shipment would not be enough. The contact must be purposeful, rather than incidental, because the stream of commerce does not refer to 'unpredictable currents or eddies.'" Renner v. Lanard Toys Ltd., 33 F.3d 277, 282 (3d Cir. 1994) (quoting Asahi, 480 U.S. at 117). It has further emphasized that without more, targeting a national market does not amount to purposeful availment of the privilege of conducting activities in a specific state. See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 103-04 (3d Cir. 2009) ("[A]ny connection of [the defendant] to Pennsylvania merely was a derivative benefit of its successful attempt to exploit the United States as a national market.").

TriMark has not shown that Tesor's or Pilock's contacts with Pennsylvania were anything more than incidental. There is nothing in the record to suggest any sort of targeting of Pennsylvania at all. The contacts with the state were minimal: Lobo Chen had driven through Pennsylvania once over 20 years ago; and Tesor's actuators were used in 75 ambulances in Philadelphia's fleet, three of which contained the actuator defect found in Medic Unit 22.[8] (Doc. No. 33 ¶ 96; Doc. No. 136-6 at 14.)

TriMark also submitted that Tesor's actuators were used in affected fleets owned by three other Pennsylvania municipalities. (Doc. No. 33 ¶ 96; Doc. No. 136-6 at 14.) But it is unknown how many of Tesor's actuators were found in those other fleets, and over what period of time these actuators came into Pennsylvania. While it is the job of TriMark to provide these figures,

---

[8]    TriMark also relies on yearly attendance at trade shows in the United States by employees of Tesor and Pilock, but these cannot be considered as availment of the forum because the trade shows were outside Pennsylvania, and no business was conducted at the trade shows that would suggest a targeting of the forum. (Doc. No. 135-6 at 93:12 to 94:15; see Doc. No. 135-13.)

even assuming that the three other fleets contained another 75 vehicles with Tesor's model actuator, the total would amount to 300 of Tesor's actuators that ended up in Pennsylvania.

According to a 2012 correspondence from Dave Magner of TriMark, HMI sells over 100,000 actuators a year to TriMark alone, which it buys from Tesor. (Doc. No. 135-10 at 4.) Therefore, even if 300 actuators were sold into Pennsylvania in one year, this would amount to a miniscule percentage of HMI's and Tesor's yearly sales. Importantly, there is no evidence that 300 of Tesor's actuators were found in Pennsylvania, but rather 75 in one fleet and an unknown amount in three other fleets.

In comparing these numbers to those in <u>Asahi</u>, the distributor there alleged that 20 percent of its sales in the United States were in California. Justice Brennan refused to find that a California court could exercise jurisdiction over the out-of-state manufacturer, Asahi, without offending traditional notions of fair play and substantial justice. Despite that, he found that Asahi's "regular and extensive sales"—100,000 annually—"to a manufacturer it knew was making regular sales of the final product in California were sufficient to establish minimum contacts with California." <u>Asahi Metal Indus. Co. v. Super. Ct. of Cal.</u>, 480 U.S. 102, 121 (1987) (Brennan, J., concurring in part and concurring in the judgment).

Here, there is no evidence that Tesor or Pilock was aware its products were being sold in Pennsylvania. Nor is there evidence that a sizable percentage, such that would constitute "regular sales" as contemplated by Brennan, of either their sales or HMI's sales were made in Pennsylvania. Therefore, these facts show much less contact with the forum by Tesor and Pilock than by Asahi in <u>Asahi</u>, and likely would not amount to sufficient minimum contacts under Justice Brennan's view.

In arguing that personal jurisdiction over Tesor and Pilock would be appropriate, TriMark offered evidence to demonstrate that the companies had knowledge their products were entering the United States. Specifically, it points to HMI's marketing brochure, which notes that HMI helps its "Asian vendors . . . better understand your quality requirements" and that its engineers "engage in an ongoing dialogue with you and the manufacturer to arrive at acceptable and achievable quality standards." (Doc. No. 135-11 at 9.) TriMark contends that this language suggests a dialogue involving the manufacturer and the client together, thus the identity of HMI's client as TriMark, an Iowa Corporation that does business in several states in the United States, including Pennsylvania, would be divulged to Tesor and Pilock. However, the language can also be read as describing different dialogues without HMI divulging the identity of its clients. (The latter would be better business practice for a distributor.)

Other evidence also suggests that HMI did not reveal to Tesor or Pilock that TriMark was its client. For example, the brochure also states that HMI "manages the entire supply chain for you, from development to delivery." (Id. 135-11 at 3.) Further, Lobo Chen asserts that he never knew where HMI ultimately sold Tesor products. (See Doc. No. 126-6 ¶¶ 14-16.) He testified that Tesor and Pilock conducted business only with HMI's facility in Taiwan, and that until 2016, he was unaware HMI had any facilities in the United States. (Doc. No. 69:2-19.) He continued that Tesor's actuators are sold "ex-factory" to "distributors in Taiwan who do not reveal to Tesor Plus the name, location and identity of their re-sale/purchasing customers or the location of those re-sale/purchasing customers." (Id. ¶ 14.)

There is however evidence tending to show that Tesor and Pilock were aware that their actuators were being sold to TriMark. Namely, there is evidence that Lobo Chen was identified in an e-mail in 2001 between Dave Magner of TriMark and Jerry Lin of HMI as a contact person

and the one who "will be handling Tri/Mark's projects from now on." (Doc. No. 135-7 at 12.) Then in 2005 and 2008, engineers from TriMark actually visited Tesor's or Pilock's facility and met with employees of Tesor or Pilock to discuss projects, including the same actuator model that was used in Medic Unit 22. (Doc. No. 135-8 ¶ 7.)

Further, Dave Magner of TriMark also communicated directly with Michael Chen of Tesor and Pilock through e-mail for a period between June 8, 2010 and July 28, 2010, and then again briefly in September 2012. (Doc. No. 135-7 at 13, Doc. No. 135-10 at 3-5.) During the course of this conversation, Michael Chen made statements characterizing Tesor or Pilock's relationship with TriMark, such as "I guess the last work partnership was [a] really long time ago," "we are going into a partnership with [TriMark] and HMI," and "you are [a] longtime customer of us or actually HMI since your order is handle[d] by them." (Doc. No. 135-7 at 8, 10.) He also discussed problems between his employer and HMI, and suggested a company to replace HMI, Creative Works, although Dave Magner did not respond favorably to the idea. (See id. at 7-8.)

Then in two different shipments in June and September of 2015, Tesor sold directly to TriMark an approximate total of 6,000 actuators, which constituted approximately one-percent of Tesor's sales in 2015. (Doc. No. 126-4 at 16:9 to 17:12, 113:12-19; Doc. No. 126-6 ¶ 15.)

TriMark also offers as evidence of Tesor or Pilock's knowledge that its products were being sold in the United States that shipping marks on orders from HMI Taiwan, which were written in English, had United States cities on them. However, Hu and YanKun testified that Tesor does not prepare HMI Taiwan's purchase orders and that HMI Taiwan makes all shipping arrangements for products bought from Tesor and pays for and provides the shipment information on Tesor purchases. (Doc. No. 126-8 ¶¶ 5-6, 10; Doc. No. 126-9 ¶¶ 5-6, 10.)

They further testified that they were not familiar with TriMark, and because their understanding of English is minimal, they both understood the term "Tri/Mark" on the purchase order to mean "shipping mark." (Doc. No. 126-8 ¶¶ 7-8; Doc. No. 126-9 ¶¶ 7-8.) They also did not know what the word "Minneapolis" on the purchase order meant; and there was no other indicator on the purchase order that the products were being shipped somewhere in the United States. (Doc. No. 126-8 ¶ 11; Doc. No. 126-9 ¶ 11.)

In light of this evidence, it is unclear what level of awareness can be attributed to Tesor and Pilock that its actuators were being sold into the United States or that TriMark was its client. There was direct contact with TriMark prior to the accident through Michael Chen, a sales representative who reported directly to Lobo Chen, and then Tesor sold directly to TriMark three years after the accident in 2015. Further, there were multiple visits by TriMark engineers to Tesor's facility. That said, Lobo Chen and two other employees testified that they never knew their products were being sold into the United States. But regardless of whether they were aware, there is still the fundamental problem that targeting a national market does not amount to purposeful availment of the privilege of conducting activities in a specific state. See D'Jamoos ex rel. Estate of Weingeroff v. Pilatus Aircraft Ltd., 566 F.3d 94, 103-04 (3d Cir. 2009) ("[A]ny connection of [the defendant] to Pennsylvania merely was a derivative benefit of its successful attempt to exploit the United States as a national market.").

TriMark also relies on Tesor's online presence, consisting of Tesor's websites and the YouTube video promoting the company, as evidence of availment of the forum. (Doc. No. 135-6 at 98:11 to 101:2.) Under the test laid out in Zippo Manufacturing Co. v. Zippo Dot Com, Inc., the propriety of jurisdiction through cyberspace depends on "the nature and quality of commercial activity that an entity conducts over the Internet." 952 F. Supp. 1119, 1124 (W.D.

Pa. 1997).  "The sliding scale ranges from situations where a defendant uses an interactive commercial website to actively transact business with residents of the forum state (personal jurisdiction exists) to situations where a passive website merely provides information that is accessible to users in the forum state (personal jurisdiction does not exist)."  Ackourey v. Sonellas Custom Tailors, 573 F. App'x 208, 211 (3d Cir. 2014).  Courts must examine "the level of interactivity and commercial nature of the exchange of information that occurs on the Web site" to determine whether personal jurisdiction exists for situations between these two extremes. Zippo, 952 F. Supp. at 1124.

TriMark contends that while direct orders cannot be made on either Tesor's website or the Alibaba website, customers can send inquiries to Tesor through its tesorplus.com website, and it should therefore be considered active or interactive.  (Doc. No. 135-6 at 98:11 to 101:2.)  This Court has found that such activity amounts to an insufficiently interactive website to justify the exercise of personal jurisdiction.  S. Morantz, Inc. v. Hang & Shine Ultrasonics, Inc., 79 F. Supp. 2d 537, 541 (E.D. Pa. 1999) (finding that "minimally interactive features . . . , including a lease application that may be printed out, but not sent over the Internet; a form through which a user may order and pay for a $10 promotional video; a form through which a user may request additional information; and a[] link by which a user may send e-mail directly to [the website owner] from the site" did not suffice to warrant exercise of personal jurisdiction).  Moreover, there is no evidence that any of Tesor's or Pilock's activities in cyberspace in any way targeted Pennsylvania, and the accident in this case did not arise from Tesor's or Pilock's contact with Pennsylvania through cyberspace.

In light of the above, TriMark has failed to make the required showing of minimum contacts needed for this Court to exercise personal jurisdiction over Tesor or Pilock.[9]

**2.        This Court need not consider the fairness prong.**

Because TriMark has failed to establish that Defendants purposefully directed their activities at the Commonwealth of Pennsylvania, it is not necessary to address the fairness element.  Specific jurisdiction does not exist.

## V.        CONCLUSION

For the foregoing reasons, Defendants Tesor and Pilock's Motion to Dismiss for Lack of personal jurisdiction will be granted.

---

[9]    While there is debate between the parties about whether Tesor and Pilock are separate entities, it is irrelevant to the outcome because Tesor or Pilock or both combined did not have sufficient contact with the forum such that a Pennsylvania court could exercise personal jurisdiction over either.